STATE V. RUSSELL JAY REGER
VOLUME 1 OF 1 VOLUME

Page 2

1            APPEARANCES

2  HONORABLE STEVE CONDER - SBOT NO. 04656510
   Assistant District Attorneys
3  401 W. Belknap Street
   Fort Worth, Texas  76196
4  Telephone:  (817) 884-1400
   Facsimile:  (817) 212-6973
5            Attorney(s) for The State of Texas.

6

7  HONORABLE RUSSELL JAY REGER -
            (APPEARING Pro se)
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Judy D. Miller, CSR
Official Court Reporter, CDC#3

Page 3

1                         INDEX

2    August 14, 2006

3                                                    PAGE    VOL.

4    Proceedings Begin ........................    5       1

5    Witnesses sworn and Rule invoked ........    6       1

6    Defense Witnesses    Direct   Cross   Voir Dire    Vol.

7    Noel Portnoy           11       45                   1
     Pamela Hand            47                            1
8

9    Arguments by Mr. Reger ...................    49      1

10   Arguments by Mr. Conder ..................    62      1

11   Court's ruling ...........................    64      1

12   Proceedings Adjourned ....................    65      1

13   Reporter's Certificate ...................    66      1

14

15              ALPHABETICAL INDEX OF WITNESSES

16                              Direct    Cross    V.Dire
     Hand, Pamela       47                          1
17   Portnoy, Noel      11        45                1

18

19

20

21

22

23

24

25

Page 4

APPLICANT'S EXHIBITS

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Affidavit of Noel Portnoy | 13 | 13 | 1 |

Page 5

1         PROCEEDINGS
2         THE COURT: This is trial court cause
3    number 0579930D, Court of Appeals Number 2-06-104CR in the
4    matter of Russell Jay Reger.
5         This hearing is being conducted pursuant to
6    an abatement order issued by the Second Court of Appeals
7    on July 12th of 2006 which granted appellant's motion to
8    abate appeal to trial court and allow filing for
9    out-of-time motion for new trial or motion in arrest of
10   judgment.
11        On July 27th of 2006 the Court granted
12   the defendant's motion to refile his motion for new trial,
13   which originally was filed June 2nd of 2006, and also
14   granted an application for subpoena for Mr. Noel Portnoy
15   to be present for purposes of this hearing.
16        Mr. Reger, are you ready to proceed?
17        MR. REGER: Yes, ma'am. Your Honor, I also
18   filed another subpoena application for James K. Walker,
19   reconsideration, which the Court received August 3rd,
20   and I was wondering if you had time to rule on that yet.
21        THE COURT: The Court did receive that.
22   The Court is going to deny your motion for reconsideration
23   and denies application for subpoena as to Judge James
24   Walker for purposes of the DNA motion hearing.
25        MR. REGER: Okay, ma'am. I have an

Page 6

1    objection that I would need to read into the record on
2    that if you want me to do it now or at the end.
3         MR. CONDER: Before we proceed, the State
4    would like to invoke the rule in this case.
5         THE COURT: All right. If anybody who is
6    present as a witness will stand up, please, and be sworn.
7         (Witnesses sworn)
8         THE COURT: Okay. If you will state your
9    name first, please, sir.
10        THE WITNESS: My name is Noel Portnoy.
11        THE COURT: And you, ma'am?
12        THE WITNESS: Pamela Keller Hand.
13        THE COURT: Both of you have been sworn as
14   witnesses, which means that you are not allowed to remain
15   in the courtroom while anyone is testifying and you will
16   have to wait out in the hall. Don't discuss your
17   testimony with anybody until after the case is concluded,
18   okay.
19        Go ahead, Mr. Reger.
20        MR. REGER: Do I remain seated here, ma'am?
21        THE COURT: That's fine.
22        MR. REGER: Your Honor, with all due
23   respect, I adamantly object, under Trap 33.1, James K.
24   Walker not being here today, even after I three times
25   requested subpoena to be issued for his presence during a

Page 7

1    live hearing in this court. May the Court take judicial
2    notice of the Second District Court's -- Appellate Court's
3    July 12 abatement order. While you did order my original
4    new trial motion be filed per that order, the Second Court
5    of Appeals then ordered that you hold a hearing on all
6    four corners of that motion with no exceptions given. .
7         That motion for new trial is 116 pages
8    total. Out of those 116 pages, 100 of them pertain to
9    James K. Walker and my issue that the proceeding herein is
10   illegal, null and void due to his constitutional
11   disqualification.
12        It also refers back to nearly the entire
13   DNA clerks' records today. In my motion to abate this
14   appeal and allow filing of an out-of-time motion for new
15   trial and motion in arrest of judgment, I informed the
16   Second Court of Appeals that the issue of my void judgment
17   would be at issue in this motion for new trial hearing.
18        The Second Court of Appeals granted that
19   motion in full. On June 26, 2006 Ms. Nancy Gilliland
20   filed a supplemental record with the Second Court of
21   Appeals which had my motion for new trial within it, so
22   that the Second Court of Appeals saw that motion before
23   making its July 12th ruling yet it noted no exception to
24   just addressing matters solely under Chapter 64.
25        I'd also filed a first amended notice of

Page 8

1    appeal to the Second Court of Appeals on July the 6th of
2    2006 seeking jurisdiction to appeal my legal, null and
3    void conviction in this case as well. No attorney
4    representing the State has opposed the issue of my
5    illegal, null and void judgment being addressed in this
6    direct collateral proceeding, nor my amended notice of
7    appeal has been objected to either.
8         There's no order from the Second Court of
9    Appeals stating that the issue cannot be the addressed in
10   this hearing.
11        I have established prima facie case that
12   James K. Walker did not file his Constitutional
13   qualifications before presiding over my original trial.
14   He also admitted to Pam Hand on the phone that he had not
15   executed, taken, nor filed his constitutional oath before
16   presiding over my original trial.
17        The evidence trail now boils down to James
18   K. Walker's answers to be given up under oath and on this
19   record. If distance was a factor, this Court could have
20   well ordered his appearance by telephonic means. I am
21   trying to adduce facts not on record, and I object to this
22   violation of my due process rights and to this most
23   honorable Court's failure to fully follow the Second Court
24   of Appeals July 12th, 2006 abatement order in full, ma'am,
25   and that's it.

Page 9

1      THE COURT: Thank you.
2      MR. CONDER: Your Honor, would you like the
3  State to respond?
4      THE COURT: Sure.
5      MR. CONDER: Your Honor, neither this Court
6  nor the Court of Appeals has jurisdiction to consider a
7  claim as to whether the original conviction was void.
8  This current Court's jurisdiction is invoked by the
9  defendant filing a motion for postconviction DNA testing
10 under Chapter 64 of the Code of Criminal Procedure.
11     The State of Texas does not authorize
12 courts to have continuing jurisdiction in criminal cases.
13 Once a conviction is final it can only be invoked in two
14 manners, an Article 11.07 writ of habeas corpus and a
15 Chapter 64 request for motion for DNA testing. Article
16 11.07 places the final decision-making process for all of
17 these exclusively with the Court of Criminal Appeals.
18     Mr. Reger has not filed an Article 11.07
19 motion for writ of habeas corpus raising these
20 jurisdictional issues. If he chooses to litigate those,
21 he has to follow the appropriate steps. The Court of
22 Appeals would have no jurisdiction to consider whether the
23 original conviction was void.
24     THE COURT: It's my understanding that we
25 are here under a Chapter 64 proceeding. If I'm wrong

Page 10

1  about the Court of Appeals order, I'm sure they will let
2  me know, but that's what we are going to be here
3  addressing today.
4      MR. REGER: I have two cases here that I
5  was going to show you. One of them is Ex Parte Seidel
6  from the Court of Criminal Appeals in 2001. The next one
7  is Ex Parte Spaulding regarding a void judgment issue.
8  The State's calling this a final conviction
9  and I am saying that it was void from the very beginning,
10 and this issue can be addressed at any time, along with my
11 Chapter 64 issues that I plan on raising here, too, ma'am.
12     THE COURT: If you will just give me the
13 cites for those I can pull them up on my computer.
14     MR. REGER: The Spaulding case is at 687
15 SW2d at 741, and the Seidel case is 39 SW3d at 221. And
16 my emphasis is on page 745 of the Spaulding case and page
17 225 of the Seidel case.
18     THE COURT: All right, Mr. Reger. Both of
19 the cases that you cite are habeas corpus proceedings. I
20 disagree with your interpretation of those and I will deny
21 your request to have the subpoena application granted as
22 to Judge Walker. But you may proceed on your motion as it
23 relates to the Chapter 64 proceeding.
24     MR. REGER: All right. I guess I will call
25 Noel Portnoy to be my first witness.

Page 11

1      THE COURT: Okay.
2      MR. REGER: Does the clerk have a spare
3  copy of this that he could look through up there, the
4  clerk's record on the DNA and supplemental, or do you want
5  me to have him just take that up there?
6      THE COURT: That'll be great.
7      (Witness sworn)
8      NOEL PORTNOY,
9  having been first duly sworn, testified as follows:
10     DIRECT EXAMINATION
11 BY MR. REGER:
12 Q.  Can you state your full name and bar card for
13 the record.
14 A.  Noel Portnoy, Bar card number 16162000.
15 Q.  Do you recall that my mother, Gaynelle Garner,
16 had initially retained you to advise me of my rights in
17 this case in April of 1995?
18 A.  As far as my recollection is concerned, I don't
19 recall her hiring me. I was hired, but I don't remember
20 that it was her that hired me.
21 Q.  I believe I retained you later on.
22 A.  Yes, I remember your payments.
23 Q.  In that representation did you prepare an
24 attorney/client file?
25 A.  Yes, I did.

Page 12

1  Q.  Did you bring that today?
2  A.  Yes, this is the original file.
3  Q.  That's the entire file?
4  A.  The entire file.
5  Q.  Have you recently reviewed that file?
6  A.  No, I have not.
7  Q.  So you are not familiar with its contents right
8  now?
9  A.  I am familiar with its contents.
10 Q.  Do you recall preparing an affidavit in this
11 court on August the 6th of 1998 during a habeas corpus
12 proceeding?
13 A.  I remember, yes, preparing that affidavit.
14 Q.  Do you have that with you today?
15 A.  I don't believe it's in this file. It's not
16 part of the attorney/client relationship file but if it's
17 not in this file, it's one of the two boxes in my car.
18 Q.  Can I provide a copy of this? It's already been
19 filed in this case. I show a filestamp from the clerk
20 here.
21 A.  May I respond? I do have a copy of that
22 affidavit in his file.
23     THE COURT: Okay. Well, he needs his back
24 probably.
25 A.  Actually it's a working draft with writing on it

Page 13

1  so it's not the final copy.
2  Q.  Have you reviewed that affidavit?
3      THE COURT: Hold on. Let me get the one
4  that you have, the file-marked copy, copied and brought
5  back so everybody has the same document.
6      Mr. Reger, you may have this marked as
7  Applicant's Exhibit 1.
8      Any objections?
9      MR. CONDER: No objections.
10     (Applicant's Exhibit 1 marked and admitted)
11     THE COURT: Applicant's Exhibit Number 1 is
12 admitted.
13     MR. REGER: Proceed, Your Honor?
14     THE COURT: Yes.
15 BY MR. REGER:
16 Q.  You are reading that right now, Mr. Portnoy?
17 A.  Yes, I am.
18 Q.  I'll give you a moment to read that.
19 A.  I've read it.
20 Q.  On pages one through three of that affidavit,
21 did you detail and swear your thorough pretrial
22 investigation to Ms. Collum?
23 A.  I did.
24 Q.  On page four, lines six through eight, did you
25 not also swear to the Court that you did not request a

Page 14

1  pretrial evidentiary hearing because the State had
2  complied with all of your evidentiary requests; there was
3  no dispute as to your pretrial motions, and the State had
4  provided you with the entire contents of their file other
5  than their work product?
6  A.  That's true.
7  Q.  You still today stand by that affirmation?
8  A.  That's my recollection.
9  Q.  In this case did the Tarrant County District
10 Attorney's office also allow you to make copies of their
11 open file?
12 A.  Yes, they did.
13 Q.  Did you not also make myself a full copy of your
14 copy that you made?
15 A.  Yes.
16 Q.  Do you also remember providing me with
17 everything you possessed during discovery in cause number
18 17/18894/99, Reger versus Portnoy?
19 A.  Yes.
20 Q.  Did you not file a motion for discovery in this
21 case, which is in the trial clerk's record, the original
22 record, at pages 21 through 28?
23 A.  I don't know what pages they are, but I filed a
24 motion for discovery.
25 Q.  You did file a motion for discovery?

Page 15

1  A.  Yes.
2  Q.  Do you have that copy with you?
3  A.  I believe I do. Yes.
4      Well, I haven't seen that particular
5  motion. I have my motions here.
6  Q.  You should have a motion for discovery --
7  A.  I'm sure it's in here.
8  Q.  -- and a motion for production and inspection.
9  A.  Yes.
10 Q.  Page one of that motion for discovery, did you
11 not request items in the possession, custody or control of
12 the State by and through its agents, the police or the
13 DA's office, which were material to the guilt or innocence
14 and punishment phase of my defense?
15 A.  Yes, in items A and C.
16 Q.  Okay. And on page three of that motion did you
17 not also request the criminal history or felony
18 convictions or misdemeanor convictions involving moral
19 turpitude of each witness which the State intended to call
20 at my trial?
21 A.  I did ask for that.
22 Q.  In your motion for production and inspection of
23 the evidence and information which may lead to evidence,
24 you filed that, did you not?
25 A.  Yes.

Page 16

1  Q.  Just for the record, that's located at pages 31
2  through 34 of the original clerk's record. You have a
3  copy of that with you?
4  A.  Yes.
5  Q.  All right. So you agree through those two
6  motions and what you remember in my defense that we were
7  looking to find impeachment evidence on Christina and
8  Vicki Storey within those discovery motions?
9  A.  Yes.
10 Q.  And we were all looking for information on
11 William Matthew Storey, the deceased in this proceeding?
12 A.  Of course, he wasn't going to be a witness, but
13 if we had evidence that he was the aggressor in this case,
14 in my opinion, that was included in my request.
15 Q.  That was our defense was to try to prove William
16 Matthew Storey was the aggressor here and I was the
17 defendant?
18 A.  Yes.
19 Q.  That was the identity issue that we were trying
20 to establish to my jury?
21 A.  Yes.
22 Q.  Do you recall in your records whether or not the
23 State ever made us aware that Christina Storey had pled
24 guilty to Class A misdemeanor assault with bodily injury
25 on March 29th of 1995? That was in Tarrant County cause

Case 4:07-mc-00033-A   Document 3-13   Filed 11/29/07   Page 7 of 20   PageID 201
STATE V. RUSSELL JAY REGER
VOLUME 1 OF 1 VOLUME

8 (Pages 17 to 20)

Page 17

1  number 0562865.
2      A.  I have no recollection one way or the other.
3      Q.  Can you -- from your records, I mean...
4      A.  It was not in the discovery I obtained. I don't
5  remember. I believe it was Mr. Rabalais was the
6  prosecutor. I don't remember. I don't have any
7  recollection. I may have and I don't remember.
8          I mean, I don't recall cross-examining her
9  --
10     Q.  You did.
11     A.  -- I mean, with the conviction.
12     Q.  Okay. Would you agree that that final
13 conviction would have amounted to a crime involving moral
14 turpitude that you could have impeached her with?
15     A.  I don't recall what the conviction was for.
16     Q.  It was for a Class A misdemeanor, assault with
17 bodily injury.
18     A.  I'm not sure that assault with bodily injury is
19 a conviction involving moral turpitude.
20     Q.  If I told you that there is two published cases
21 out of the Austin Court of Appeals on that --
22     A.  I would not dispute that.
23     Q.  Had you known of that fact, would you have
24 brought that to my jury's attention? Would you have moved
25 to impeach her?

Page 18

1          MR. CONDER: Your Honor, I'm going to
2  object. I don't see how this goes to the issues of 64.03
3  as to how he meets the requirements for DNA testing.
4          THE COURT: Sustained.
5          MR. REGER: Can I comment on that, Your
6  Honor?
7          THE COURT: Sure.
8          MR. REGER: It goes towards identity
9  factors on credibility issues in the order on deciding the
10 identity issue that I was trying to present at my trial.
11 This is totally going towards impeachment value towards
12 that witness, which was the State's sole witness in that
13 proceeding. That's what I am trying to establish on the
14 for the Second Court of Appeals, that she was thoroughly
15 impeached.
16         THE COURT: I'm going to sustain the
17 State's objection as to the last question.
18 BY MR. REGER:
19     Q.  Before my trial did the State afford with you a
20 true copy of Arlington Police Report 910155968 regarding
21 the arrest and conviction of William Matthew Storey for
22 the offense of a DWI and unlawfully carrying deadly
23 weapons?
24     A.  I don't recall if they did or didn't.
25     Q.  I have that.

Page 19

1          MR. REGER: At this point, ma'am, I need to
2  have him refer to these.
3  BY MR. REGER:
4      Q.  If you will look at pages 34 through 71 on that
5  clerk's record. There is a copy of that report.
6      A.  I've had a chance to review it.
7      Q.  Do you recall at any time ever seeing that
8  report in any of the State's cases or being afforded with
9  that?
10     A.  I would have to look at my file. I see in my
11 file a probation for driving while intoxicated for Matthew
12 Storey.
13     Q.  You should have the indictments on that, is that
14 correct, copies of the indictments?
15     A.  With respect to Matthew Storey?
16     Q.  Yes.
17     A.  No, I don't have a copy of an indictment on
18 Matthew Storey. I have a DWI driving record and a report
19 that he received probation on April 3rd, 1995. No,
20 that's the time of the report. 1988 -- the arrest was
21 1988.
22     Q.  Through that report that I just showed you, had
23 you ever at any time known that he had been arrested for
24 not only a DWI but he also was found with two pairs of
25 numchucks up underneath the front seat of his car?

Page 20

1          MR. CONDER: Your Honor, I'm going to
2  object again to the relevance of this line of questioning.
3  It doesn't -- it's an attack on the credibility of the
4  State's witnesses. It doesn't go to whether identity was
5  an issue in this case. It only goes to -- it's a
6  challenge to the credibility of a self-defense claim.
7          THE COURT: Which I think Mr. Reger's point
8  is that if he is able to show that his self-defense claim
9  was credible that that puts identity in issue.
10         MR. REGER: Yes, ma'am.
11         THE COURT: So I will let him complete this
12 line of questioning.
13         MR. REGER: Thank you, Your Honor.
14     A.  If he had a prior conviction for unlawfully
15 carrying of a weapon, I would have, and if I had known
16 that or if I knew it, I should have at least offered it
17 possibly outside the presence of the jury and gotten a
18 ruling from Judge Walker.
19 BY MR. REGER:
20     Q.  Thank you. That's what I was looking for.
21     A.  I don't see that in the records that I was
22 provided.
23     Q.  Moving along, I will go to the next one. Do you
24 recall the fight between Matt Storey and Michael Furrh
25 which occurred on August 20th, 1994, in the Sleepy Hollow

### Page 21

1 Apartments?
2   A.   I remember there was a fight in the parking lot.
3        MR. CONDER: Your Honor, I'm going to
4 object again to the relevance that this matter is not
5 relevant to the identity issue in the actual killing of
6 Matthew Storey.
7        THE COURT: Overruled.
8        MR. REGER: Thank you, Your Honor.
9 BY MR. REGER:
10  Q.   Did the State afford you a true and correct copy
11 of Arlington Police Report 940125500 or 9401254475?
12  A.   Not that I am aware of.
13  Q.   Those are located in the clerk's record at
14 pages 72 through 81.
15  A.   I don't recall seeing that, but I would have to
16 review the file thoroughly. I don't recall seeing that in
17 any records provided me in discovery. If I could
18 elaborate, my recollection is that I've given you, through
19 various proceedings, a copy of the entire contents of my
20 file.
21  Q.   You will stipulate to that, everything I have,
22 you have, that you've given me a copy of --
23  A.   Everything in my trial file you have.
24  Q.   Okay. But as far as those reports that I just
25 mentioned --

### Page 22

1   A.   I haven't seen --
2   Q.   You've never seen --
3   A.   I don't recall those.
4        THE COURT: One person at a time.
5 BY MR. REGER:
6   Q.   Now, within your sworn affidavit in the habeas
7 proceeding you said that you decided not to call Michael
8 Furrh because you felt he was a hostile witness toward the
9 defendant?
10  A.   Yes.
11  Q.   And in those police reports that I just pointed
12 out to you, you were never made aware that Brenda Furrh,
13 which was Michael Furrh's mother, had also been present
14 during that fight and she could have been called as a
15 witness?
16  A.   I wasn't aware of it.
17  Q.   You were not aware of it?
18  A.   Well, I have no recollection one way or another
19 that I knew that Brenda Furrh was a witness to the fight.
20  Q.   Okay. I'll try to speed this up, Your Honor. I
21 will go to the next thing.
22       Do you have a copy of Mr. Furrh's interview
23 with Dalworthington Gardens' Lieutenant Jerry S. Vennum
24 and Catherine R.L. Parson in the file? If not, I have a
25 copy of it in the clerk's record at pages 82 through 96.

### Page 23

1   A.   I'm sorry, you are asking me if I have a copy of
2 a report of an interview of Michael Furrh regarding the
3 fight?
4   Q.   Yes. That's in my clerk's record over there. I
5 am wanting you just to focus on pages 82 and 91 of that
6 clerk's record, if that can refresh your memory.
7   A.   No. I have an interview with Vicki Storey but
8 not with Michael Furrh.
9   Q.   In that interview record I am pointing you to in
10 the clerk's record, specifically pages 82 and 91, do you
11 see where Michael Furrh was admitting to Officer Jerry
12 Vennum that he had been assaulted by a Matthew Storey?
13       MR. CONDER: Your Honor, I'm going to again
14 object on hearsay and relevance grounds to how it was not
15 related to how the defendant shot Matthew Storey.
16       THE COURT: Overruled.
17  A.   I see that on pages 82 and 83. The first time
18 I've seen it that I can recollect.
19 BY MR. REGER:
20  Q.   On -- I believe it is at Page 91 of that clerk's
21 record, which would be page ten on that report, do you see
22 where Michael Furrh admitted that he had called Matt
23 Storey four to five weeks before April 2nd of 1995 and
24 had set Matt Storey against me?
25       Should be the third paragraph down.

### Page 24

1   A.   I am reading it for the first time. I don't
2 necessarily characterize it as setting off anyone against
3 you, but it says what it says.
4   Q.   Do you remember me testifying at trial that Matt
5 Storey, at one point about -- approximately three weeks
6 before that occurrence, that he had mentioned that phone
7 call from Mr. Furrh?
8   A.   I can't recall. I have never read the statement
9 of facts for the trial.
10  Q.   Just for the record, that's Reporter's Record,
11 Volume 5, at page 340.
12       In that same page that you just read right
13 there, do you see where Michael Furrh had talked about
14 Matt's mother, Dora Storey, and Brenda Furrh, which was
15 Michael Furrh's mother, also being on the phone when he
16 had made that phone call to William Matthew Storey?
17  A.   I see that Matt's mom is on the other end of the
18 phone listening in, according to what Michael Furrh's
19 telling the officer.
20  Q.   Do you ever recall cross-examining Dora's story
21 as to that phone call during my trial?
22  A.   Dora's?
23  Q.   Yes.
24  A.   I cannot recall the particulars of that
25 cross-examination.

Page 25

1   Q. Did the State afford you with a true copy of
2   Pantego Police Report 94015895? That is regarding the
3   arrest of William Matthew Storey regarding the assault
4   bodily injury of Christina Renae Ragland Storey? That
5   would be at pages 370 through 377 of that clerk's record.
6        MR. CONDER: The State would again
7   reiterate its objection to relevance in this matter.
8        THE COURT: Overruled.
9   A. I don't recall seeing that. I am looking at the
10  record you are referring to. I don't recall seeing it
11  before. I don't see it in the file that I have.
12  BY MR. REGER:
13  Q. Would you turn back to page 355 on that clerk's
14  record. That was your examination during trial of
15  Christina Storey, which is at Reporter's Record, Volume 6,
16  pages 277 through 280.
17       Could you refresh your memory with that
18  testimony?
19  A. I see that. I did cross-examine her.
20  Q. On that particular offense?
21  A. Yes.
22  Q. And do you recall on that testimony that she
23  testified under penalty of perjury that Matt Storey had
24  never laid a hand on her during that October 8th, '94
25  assault?

Page 26

1   A. That's what she testified to, that Matthew did
2   not hurt her.
3   Q. Did the police ever afford you with a copy of
4   this photograph here, Mr. Portnoy, of her injuries? That
5   goes with that police report there.
6   A. I don't recall. I have a separate file for the
7   photos.
8        No, I did not receive that, but I can tell,
9   based on reviewing of the file, that I had in front of me
10  a copy of those photos, but I can't say I have an
11  independent recollection of it.
12       MR. REGER: Your Honor, may I pass this to
13  him?
14       THE COURT: Yes.
15  BY MR. REGER:
16  Q. After reviewing the testimony on the trial
17  record that that she stated that Matthew never laid a
18  single hand on her, do you also recall in that same
19  testimony that she said that she gave another affidavit
20  swearing under penalty of perjury to Matthew's lawyers
21  denying that assault?
22  A. Are you asking me if she testified to that in
23  this testimony here?
24  Q. Yes. Do you recollect her telling me that under
25  oath?

Page 27

1   A. Yes, she states -- signed a statement from
2   Matt's lawyer saying that, "he did not abuse me or hurt me
3   physically."
4   Q. She was specifically talking about the October
5   8th, 1994, assault? That's what you were examining her
6   on, and I believe you showed her a copy of indictment that
7   you had in your files at the time.
8   A. Yes. I believe that would have been probably in
9   the information.
10  Q. Would that constitute impeachment evidence
11  against Christina had you had that report in your
12  possession?
13  A. Yes, and particularly the photographs.
14  Q. From these photographs, what you're seeing right
15  here, do you see that as playful or unintended?
16  A. No.
17       MR. CONDER: Objection. He hasn't
18  established Mr. Portnoy's medical qualifications to
19  determine whether that is evidence of playful injuries.
20       THE COURT: Sustained.
21       MR. REGER: May I comment on that?
22       THE COURT: Sure.
23       MR. REGER: I have a report from a United
24  States Magistrate Judge right down the street during my
25  federal habeas proceeding. From the record, from a

Page 28

1   disinterested jurist, when he read the record, that was
2   what his account of what my jury saw without having these
3   reports and records, that he concluded that it was
4   unintentional and playful acts by the deceased in this
5   case.
6        That's the only thing that I was trying to
7   point out on the record is from my ex-attorney's
8   perspective, that him now seeing this evidence on record,
9   does he believe in his opinion that it's unintentional or
10  playful acts. That's all I was going to prove up.
11       THE COURT: I still sustain the State's
12  objection.
13       MR. REGER: Okay. Thank you.
14  BY MR. REGER:
15  Q. In that Pantego Police Report that we were just
16  reading, do you see -- that is going to be at page 371 or
17  372 where the handwritten accounts are. Do you see where
18  Christina Storey described Matthew Storey as being very
19  intoxicated, acting very hostile and very upset when he
20  assaulted her just because he -- or she had mentioned her
21  ex-boyfriend's name?
22  A. It states that the suspect had been drinking and
23  was very hostile.
24       MR. CONDER: Your Honor, I object as
25  hearsay.

Page 29

1    THE COURT: Overruled.
2    A.   The reporting person stated that the suspect had
3    been drinking and was very hostile.
4    BY MR. REGER:
5    Q.   Do you see where that occurrs because he was
6    feeding her dogs at that time and she had asked him to
7    stop?
8    A.   The dogs were fighting in the house and he was
9    mad at the dogs, told the suspect not to beat the dogs,
10   since that's what her ex-boyfriend Jeffrey had done.
11   Q.   And then he grabbed her by the throat?
12   A.   It states, "The suspect grabbed the reporting
13   person by the throat and pushed her down onto the couch;
14   struck suspect in the face; pushed her over a stereo
15   speaker causing it to scratch her left leg on her calf."
16   Q.   And then going to page 374 of that, she also
17   recounted that to Detective Sandra Blackney with the
18   Pantego Police Department two days later, did she not?
19   A.   Yes. She doesn't recount it as being that
20   severe at that time.
21   Q.   In your opinion, from what you remember from
22   this trial record, does that corroborate my trial
23   testimony regarding Matt's hostile, intoxicated and
24   assaultive nature?
25   A.   Yes, it does.

Page 30

1    Q.   You would have used that to my jury?
2    A.   Yes, I would have.
3    Q.   Thank you. Did the State afford you with a true
4    copy of Pantego Police Department 94013369 and 94013485
5    regarding the assault of Vicki Storey by Matthew Storey
6    which occurred on August 25th of 1994?
7        MR. CONDER: Objection, relevance.
8        THE COURT: Overruled.
9    A.   No, they did not.
10   BY MR. REGER:
11   Q.   That's a DNA record at page 379 through 386.
12   A.   No, 379 through what?
13   Q.   379 through 386.
14   A.   No.
15   Q.   You've never seen those before?
16   A.   I have not.
17   Q.   Have you read the description of what occurred
18   on that day from the very front cover?
19       MR. CONDER: Objection. The witness stated
20   he has not seen that before. He does not have any
21   firsthand knowledge of this information.
22       THE COURT: Sustained.
23   BY MR. REGER:
24   Q.   As far as that report goes, if you would have
25   known about that, would you have made that information

Page 31

1    available to my jury?
2        MR. CONDER: Objection, speculation. He
3    has not seen the report; he doesn't know whether he would.
4        THE COURT: Overruled.
5    A.   If I had evidence to impeach her testimony, I
6    would have offered it.
7    BY MR. REGER:
8    Q.   That's what I am getting to next. In that
9    police report right there, that police officer makes a
10   summary on there that he felt that Vicki Storey was making
11   up a lot of her testimony in that report in retaliation to
12   the custody issue between her and Matthew Storey.
13   A.   Is that a question?
14   Q.   Yes. Do you see that?
15   A.   On 382, it states in the officer's report, "It
16   is noted as well the timing of this report comes after a
17   restraining order was placed on Vicki Barnett. It is also
18   noted that there is a pending divorce and custody battle
19   for the child."
20   Q.   Would you have used that information in there?
21   There is more on the summary on that that talks about her
22   making a -- the officer felt that she was making a
23   retaliatory report in there. You had not seen that in
24   there yet?
25   A.   Not retaliatory. I have not seen retaliatory

Page 32

1    yet.
2    Q.   It might be towards the front. If that states
3    that in that report, would you have used that to impeach
4    Vicki Storey's testimony?
5    A.   I don't see how I could use the allegation that
6    she was making it up to impeach her testimony. I mean, if
7    the issue is aggressiveness by the deceased, my thought
8    would be to focus on that issue and not to go down, you
9    know, who is at fault in some custody proceeding.
10       I would want to show that Matthew was the
11   aggressor in the incident, and if by impeaching Vicki's
12   story by his assault upon her through other witnesses to
13   impeach her testimony, which the judge did allow me to
14   question her, then I would have focused on that issue.
15       Now, I don't know that I would have then
16   said, well, maybe she is making this up because -- if the
17   prosecutor can do that then -- if the Judge let the
18   prosecutor do it over my objection. I don't think I would
19   have gone that far, but sitting here just trying to make a
20   judgment call as to --
21   Q.   I understand and I --
22   A.   -- how I would have handled a situation in a
23   courtroom years and years ago.
24   Q.   My focus was primarily on the fact that we had
25   offered defense witnesses that testified things that Vicki

Page 33

1  had told me and had told my mother and had told Pamela
2  Hand about the assaultive nature of William Matthew Storey
3  which she got up on the stand and later denied, and that's
4  where the impeachment value -- I am asking, would have
5  that come into play if you had used it at that point?
6      A.  If I could impeached her testimony on that
7  issue, yes.
8      Q.  To show that she was not a credible witness?
9  That's all I wanted to get to.  Thank you.
10     A.  Not that she was not a credible witness, but
11 that impeaching that point that on that particular
12 occasion Matthew was the aggressor, that was what I was
13 focussed on.
14     Q.  In that particular report there she described
15 William Matthew Storey was picking her up by her side and
16 putting her over his head and then slamming her to the
17 hard ground and then sitting on top of her until the
18 police arrived?
19     A.  If that is what she says, then...
20     Q.  That's what's narrated in the report.
21     A.  I wish I knew that report was made to a police
22 officer.
23     Q.  But you had never seen that before?
24     A.  I did not see that.
25     Q.  Thank you, sir.

Page 34

1         Going on, did the State afford you with a
2  copy of Arlington Police Report 940105084 regarding the
3  assault of Vicki Storey and Michael Furrh by Matt Storey
4  that occurred on July 22nd, 1994?
5         MR. CONDER:  The State would again argue
6  that this is not relevant to the identity of the shooter
7  April 2nd, 1995.
8         THE COURT:  Overruled.
9      A.  Could you direct me to those pages again?
10 BY MR. REGER:
11     Q.  That report would be --
12        MR. REGER:  I've got that this is a part of
13 a report that has not been filed into the record yet.  I
14 filed two separate requests to have this specifically put
15 into a supplemental record, and I've had a problem with
16 the clerk on this.  I was going to clarify that before we
17 ended today, but this pleading is already in this court on
18 file.  It's called Defendant's Subsequent Addendum to
19 Original and Second Petitions for a Formal Bill of
20 Exception.
21        Could I show this to Mr. Portnoy so he can
22 refresh his memory off of his report?
23        THE COURT:  Let me see it first, please.
24        Okay.  This is in the court's file,
25 file-marked August 1st of 2006, and it was a copy that

Page 35

1  was filed in the district clerk's file.
2         MR. REGER:  So there's already been another
3  subsequent record made on that with that pleading in it?
4         THE COURT:  It will be added as part of the
5  supplemental record, I think, that goes with this hearing
6  but I will show the witness the affidavit that you wanted
7  directed.
8         MR. REGER:  Thank you, Your Honor.
9  BY MR. REGER:
10     Q.  There should be some other lines I wanted to
11 address.
12     A.  I have never seen that before.
13     Q.  Do you see where Arlington Police Department,
14 Officer Jay McSpadden, heard Michael Storey threaten
15 Michael Furrh's life over the phone while he was at Vicki
16 Storey's residence on that date?
17        MR. CONDER:  Objection, relevance.
18        THE COURT:  Reask that.
19 BY MR. REGER:
20     Q.  I would ask if Officer Jay McSpadden, while he
21 was over at Vicki Storey's residence on July 22nd of
22 1994, heard William Matthew Storey threatened Michael
23 Furrh's life over the phone.
24        MR. CONDER:  I also object on hearsay
25 grouds and relevance.

Page 36

1         THE COURT:  Overruled.
2      A.  I see that underlined, "his time is coming," and
3  this is the first time I've looked at it.  Apparently --
4  it refers to Michael, so I'm going to presume that's
5  Michael Furrh.  But just looking at it the first time,
6  I...
7  BY MR. REGER:
8      Q.  In your opinion, from what you are reading right
9  there, do you feel that is material to the testimony at
10 trial that I testified that Matt called and threatened me
11 on April the 2nd, 1995?
12        MR. CONDER:  Objection, relevance.
13        THE COURT:  Overruled.
14     A.  Well, I am thinking in terms of what the Court
15 would have let me -- let in.  And I don't know, if he
16 threatened someone else on another occasion, if he would
17 have allowed that threat against that other person to come
18 in your trial.  But I didn't have the opportunity to even
19 know about it to make that decision at that time.
20 BY MR. REGER:
21     Q.  Okay.  As the record reflects during trial, I
22 had testified that William Matthew Storey had called my
23 home and threatened me and the State offered witnesses
24 that said that Brittany Helen Storey had called Matthew
25 Storey's house.  That's what I was trying to establish as

Case 4:07-mc-00033-A Document 3-13 Filed 11/29/07 Page 12 of 20 PageID 206
STATE V. RUSSELL JAY REGER
VOLUME 1 OF 1 VOLUME

13 (Pages 37 to 40)

Page 37

1  a part of my defense, the way I reacted was because he had
2  called my home.
3           If I had known about that, could you have
4  offered that as a propensity-type evidence?
5           MR. CONDER: Objection, speculation.
6           THE COURT: Overruled.
7     A.   If I had known about it, I would have offered
8  it. I don't know the Judge would let it in.
9  BY MR. REGER:
10    Q.   That's all I wanted to get at, sir. Thank you.
11          Did the State afford you with a true copy
12 of Arlington Police Report 940124913 that's also up
13 underneath that report you just reviewed there as
14 regarding the terroristic threats made by Matthew Storey
15 to Michael Furrh on July 24th of 1994, August 6th of 1994,
16 August 18th of 1994 and August 27th of 1994?
17          MR. CONDER: The State again objects on
18 relevance grounds since it doesn't involve the defendant.
19 Terroristic threats allegedly by the victim against a
20 third party are not relevant to whether the defendant was
21 the one who shot Matthew Storey on April 2nd, 1995.
22          THE COURT: Overruled.
23    A.   I have not seen this report before.
24 BY MR. REGER:
25    Q.   You have not seen that one either?

Page 38

1     A.   No.
2     Q.   Do you see the reporting officer stating in that
3  report that Matthew Storey had threatened his life on
4  numerous occasions?
5           MR. CONDER: Objection, hearsay.
6           THE COURT: Overruled.
7     A.   That's what the report states, three dates.
8  BY MR. REGER:
9     Q.   Was that material to my identity issue that I
10 offered in my trial, in your opinion?
11    A.   Material? I would say it's material.
12    Q.   Thank you, sir. Now, reflecting on that report
13 right there, Michael Furrh finally told the police about
14 those threats on August 27, 1994 at four in the morning,
15 did he not?
16    A.   August 27th, four o'clock, Officer Shook was
17 dispatched to 3805 Ichabod Circle, Number 152, and
18 contacted Michael Furrh.
19    Q.   Okay. And the reports that I mentioned to you
20 earlier, which were the DNA clerk's record 72 through 81,
21 that offense that occurred, the assault in Sleepy hollow
22 apartments, that happened on August 28th of 1994 at 12:30
23 in the morning. Did you recognize that time and date on
24 there when you were referring to it earlier?
25    A.   No, I didn't.

Page 39

1     Q.   You didn't?
2     A.   To answer your question. What report are you
3  referring to now, please?
4     Q.   The original one is the clerk's record at 72 --
5     A.   Seventy-two.
6     Q.   The big clerk's file.
7     A.   Yes. The stated date of offense on page 73 of
8  that file is August 28th.
9     Q.   So within a matter of somewhere to 15 hours, do
10 you see that Matt had made good on his threats to Michael
11 Furrh?
12    A.   The August 28th report refers to the altercation
13 in the parking lot --
14    Q.   Yes.
15    A.   -- so it would be our argument that he made good
16 on the prior threats.
17    Q.   So if you had known about those two reports, you
18 would have made that information available to my jury
19 showing his propensity --
20    A.   Yes.
21    Q.   Do you feel that those reports, in your opinion,
22 corroborate my testimony in trial regarding Matthew
23 Storey's behavior?
24    A.   Yes, I do, absolutely.
25    Q.   Did the State afford you with a true copy of

Page 40

1  Arlington Police Report 940140746 regarding Matthew
2  Storey's daytime damage to Michael Furrh's vehicle which
3  occurred on September 27th, 1994?
4           MR. CONDER: Objection, relevance.
5           THE COURT: Overruled.
6     A.   What page would that be?
7  BY MR. REGER:
8     Q.   That would be in that subsequent addendum that I
9  gave you towards the back. It's got a bunch of receipts.
10    A.   What number, please? 59?
11    Q.   Yes, I believe so.
12    A.   I am looking at it. I don't recall -- I don't
13 recall seeing this report.
14    Q.   Now, these reports that I've pointed out to you
15 that you referred to that you've never seen before, the
16 information that you -- I know you haven't been able to
17 thoroughly look at them, but from what you've seen from
18 the underlying offense, do you feel that it exhibits
19 Matthew Storey being an aggressor or an aggressive-type
20 person?
21    A.   Most of them do. The last one refers to
22 Christina assaulted him.
23    Q.   So you agree that he had an extensive history
24 that we weren't made aware of during my defense?
25    A.   Yes. There is evidence that I was not made

### Page 41

1  aware of and you were not made aware of.
2  Q. Lastly, in that same pleading that you are
3  looking at there, did the State afford you with a copy of
4  Arlington Police Report 940146259 regarding the assault of
5  William Matthew Storey and Christina Renae Ragland Storey?
6  A. That was the last one I was referring to was
7  259. If there is another one --
8      MR. CONDER: State again objects to
9  relevance at this time. An offense where the alleged
10 victim was also a victim in another offense is not
11 relevant.
12     THE COURT: Overruled.
13 A. Well, the testimony I gave on the last report,
14 I'm not sure what report you were talking about. I was
15 talking about number 59.
16 BY MR. REGER:
17 Q. Okay. The one with all of the automotive
18 receipts is the one I was talking about last. It's got a
19 narrative and automotive receipts. It's not been numbered
20 yet in the record.
21 A. There is an offense report 940140746.
22 Q. That's the one I was talking about earlier.
23 A. And it has some automotive receipts.
24 Q. Do you see on there the narrative where the
25 officer states that numerous witnesses saw William Matthew

### Page 42

1  Storey come to Michael Furrh's residence at that time and
2  vandalize his car?
3  A. Yes.
4  Q. Would you have made that information known to my
5  jury had you been afforded with it?
6  A. I don't know that that is admissible. I would
7  have certainly very seriously considered offering it in
8  evidence through whatever witnesses I could.
9      The fact that he vandalized a car on
10 September 25th, 1994, if I had testimony to that effect,
11 I would have certainly considered offering it.
12 Q. Do you agree that it shows that William Matthew
13 Storey traveled to Michael Furrh's location to deliver?
14 A. Yes, I agree.
15 Q. In regards to that last report that I asked you
16 about, obviously you've already testified on the record
17 that you have never seen it before.
18 A. Right. I had never seen four six before.
19 Q. That refers to the original report that I asked
20 you about earlier, Christina Storey had pled guilty to
21 that assault on March 29, 1995.
22     MR. CONDER: State again objects to the
23 relevance on Christina Storey's conviction.
24     THE COURT: Overruled.
25 A. And the question, please?

### Page 43

1  BY MR. REGER:
2  Q. As far as that report goes, that is in regards
3  to what I had asked you earlier about if you had known
4  whether or not Christina had pled guilty to that assault
5  with bodily injury on March the 29th, 1995. And in that
6  same report there she also states that she had been
7  assaulted by Matthew Storey on that date.
8  A. I frankly can't recall the admissibility of that
9  issue, Christina assaulting Matthew. Sort of makes him
10 look like a good guy.
11 Q. Actually, the police officer, she testifies --
12     MR. CONDER: Objection, hearsay.
13     THE COURT: Overruled.
14 BY MR. REGER:
15 Q. She testifies in the police report on October
16 8th, 1994, that she had also been assaulted October 5th of
17 1995 and that's what the police had seen when they arrived
18 at the scene, is they then seen her assault Matthew
19 Storey, and that's the conviction that she pled guilty for
20 later.
21 A. If she testified on October 5th that Matthew
22 assaulted her, that would have been more or less to our
23 benefit. I'm not sure I would have wanted to impeach her
24 but if, in our judgment, the impeaching of her outweighed
25 -- if the pluses outweighed the minuses to impeach her,

### Page 44

1  yes, I would have impeached her testimony through the
2  evidence in this report. And I would have tried to do so
3  through the testimony of Officer Rogers, who saw her, I
4  guess, scratching him or hitting him or striking him,
5  whatever is in the report.
6  Q. That's all I have on that, sir.
7      So after you've reviewed all of this
8  evidence I've just shown you, do you still swear that the
9  State fully complied with all of your discovery requests
10 in this proceeding?
11 A. No, I don't think they did.
12 Q. Do you care to redact that part of that
13 affidavit?
14 A. I would say that there was sufficient -- there
15 was considerable testimony or evidence that was not
16 provided me in accordance with my motion. I remember when
17 I copied the file, Mr. Rabalais handed me his full file,
18 so that's what I remember about that.
19 Q. There is considerable evidence going towards the
20 identity factor of who acted as the aggressor and who
21 acted as the defender that night that could have been
22 presented to my jury?
23 A. I'm not sure it's an identity factor. It's who
24 was the aggressor and who was the assaultive person and
25 whether or not you acted in self-defense.

Page 45

1   Q.  You do agree that self-defense is an identity
2   issue, do you not?
3   A.  I've never thought of it, frankly, as an
4   identity issue. It's who assaulted who and who had a
5   right to use reasonable means of self-defense.
6   Q.  And it's a legal form of innocence, the jury
7   would have found me --
8   A.  Self-defense is a legal defense.
9   Q.  That's all I have.
10      MR. REGER: You've already ruled that I
11  can't go into anything on my void judgment issue?
12      THE COURT: Correct.
13      MR. REGER: So I can't ask him any
14  questions pertaining to anything on that matter?
15      THE COURT: Correct.
16      MR. REGER: That's all I have for this
17  witness.
18          CROSS-EXAMINATION
19  Q.  Mr. Portnoy, I just have a few questions for
20  you.
21  A.  Yes, sir.
22  Q.  In this case, the defense was self-defense; is
23  that correct?
24  A.  Yes.
25  Q.  And you put on a self-defense case; is that

Page 46

1   correct?
2   A.  Tried to.
3   Q.  And you had an instruction in the jury charge on
4   self-defense; is that correct?
5   A.  I believe the Judge gave me the instruction.
6   Frankly, I haven't read it lately and I have no
7   independent recollection, but I believe that he gave me
8   the instruction. The record speaks for itself.
9   Q.  And in presenting the self-defense, did not the
10  defendant admit to shooting Mr. Storey?
11  A.  Yes.
12  Q.  This was always -- this case -- there was never
13  indication that some other person shot Mr. Storey?
14  A.  No.
15  Q.  This is simply a case of why this shooting
16  occurred rather than who was involved; is that correct?
17  A.  Yes.
18      MR. CONDER: The State has no further
19  questions.
20      THE COURT: Redirect.
21      MR. REGER: I have no further questions,
22  Your Honor.
23      THE COURT: May this witness be excused?
24      MR. REGER: Yes.
25      THE WITNESS: May I take all of my file

Page 47

1   with me, Judge?
2       THE COURT: Yes.
3       You've got one more witness that you want
4   to call; is that right?
5       MR. REGER: Yes, ma'am.
6       THE COURT: Can we take about a five-minute
7   recess?
8       (Recess at 11:15 a.m.)
9       PAMELA KELLER HAND,
10  having been first duly sworn, testified as follows:
11          DIRECT EXAMINATION
12  BY MR. REGER:
13  Q.  Did you bring a copy of an affidavit you
14  executed October 11, 2004?
15  A.  I did. I don't have it with me up here.
16      MR. REGER: If I can have a moment, Your
17  Honor.
18      For the record, this affidavit is on file
19  in this cause at clerk's record 189 through 191.
20  BY MR. REGER:
21  Q.  That affidavit is three pages in length that you
22  have?
23  A.  Yes.
24  Q.  Have you reviewed that affidavit in anticipation
25  of testifying here today?

Page 48

1   A.  I sure have.
2   Q.  Do you recall that I instructed you to call
3   James S. Walker on the phone in April of 2002?
4       MR. CONDER: Objection. The Court's
5   already ruled it's not hearing this matter on the issue of
6   Judge Walker.
7       THE COURT: Sustained.
8       MR. REGER: That's all I have, Your Honor.
9   That's all I had this witness for.
10      THE COURT: Her affidavit is already
11  included in the clerk's record.
12      MR. REGER: I'm wanting to prove it up for
13  the Second Court of Appeals for review when I do my
14  appellate brief. That's what my whole intention was.
15      THE COURT: Do you want her to identify it
16  for the record?
17      MR. REGER: Yes, ma'am, that would probably
18  be easier.
19      Can I show her this record?
20      THE COURT: Yes.
21  A.  Yes, this is my affidavit.
22  BY MR. REGER:
23  Q.  That's your signature?
24  A.  Sure is.
25  Q.  Notary, everything is an exact same copy that

Page 49

1  you made?
2  A. Yes.
3  Q. Everything you stated there true and correct
4  still today?
5  A. Of course, it is.
6    MR. REGER: That's all I have, Your Honor.
7
8    MR. CONDER: No questions, Your Honor.
9    THE COURT: All right. If you will take
10 off that microphone, you can step down.
11   Is it okay if she stays in the courtroom?
12   MR. CONDER: Yes, Your Honor, the State
13 doesn't have any objection to that.
14   THE COURT: Go ahead, Mr. Reger.
15   MR. REGER: Can I go ahead and comment on
16 the State's reply and on my motion for new trial?
17   THE COURT: For argument purposes?
18   MR. REGER: Yes.
19   THE COURT: Does the State have any
20 evidence to present?
21   MR. CONDER: No, Your Honor, the State has
22 no evidence to present.
23   THE COURT: Go ahead.
24   MR. REGER: In the State's July 27th
25 reply to my motion for new trial they contended since I

Page 50

1  admitted to shooting William Matthew Storey in
2  self-defense that identity was not or is not an issue in
3  this case. The State cited case law in support in that
4  reply. However, it fails for a number of reasons.
5    First off, the Hurd versus State case they
6  cited to, which I have that right here, it's an
7  unpublished opinion, and Roughley versus State citations,
8  I would like to point out on record that neither of these
9  cases have any precedential value under Texas rules
10 unpublished cases.
11   Second, the Hurd versus State case dealt
12 with a completely different set of circumstantial facts
13 that are distinguishable from my case, specifically, that
14 the shooting of a police officer occurred in a confined
15 room in which Mr. Hurd admitted to firing his weapon but
16 then claimed to not have known who he was shooting, nor
17 that it was a police officer.
18   In my case, William Matthew Storey called
19 my home and threatened myself and came over to make good
20 on his threats. There was no question about who I was
21 defending myself against.
22   Third Roughley, the Roughley versus State
23 case also dealt with a completely different set of
24 circumstantial facts that are distinguishable from my
25 case, specifically the stabbing of a man that was already

Page 51

1  with Mr. Roughley. In Mr. Roughley's case the record is
2  devoid of any other facts whether or not there had been
3  bad blood between the two before the altercation, nor how
4  it was that they'd come together, nor even what and if and
5  how the use of a knife was called in the altercation. The
6  record also does not reveal whether or not Mr. Roughley
7  knew of the deceased's past nor if it was one filled with
8  an aggressive, assaultive and hostile history like I knew
9  Matthew Storey's to be in my case.
10   Fourth, the Hurd and Roughley decisions are
11 out of the Fifth District Court of Appeals in Dallas, not
12 our of our Second Court of Appeals here in Fort Worth.
13   Fifth, each and every one of the State's
14 case citations in its reply are all based upon pre-2003
15 amended Chapter 64 statutory law and case law. My case
16 law falls under the post-2003 amended Chapter 64 Statutory
17 law and case law.
18   The State's reply also incorrectly asserts
19 that "while whether the defendant acted in self-defense
20 was a question for the jury, there was no question that
21 the defendant fired the murder weapon." That is at
22 Section VI of the reply.
23   I contend that in Texas a finding of not
24 guilty by reason of self-defense is a legal finding of
25 innocence. It's called justified homicide.

Page 52

1    While it may have once been a question for
2  my illegal jury to decide, it is now a question for this
3  Court involving my identity because self-defense requires
4  an aggressor and it requires a defender.
5    Under Texas Code of Criminal Procedure
6  Article 64.03(a)(1)(B), this Court is endowed with
7  jurisdiction to consider all evidence surrounding my legal
8  innocence claim of self-defense. Nothing in the Statute
9  under Chapter 64, nothing in the case law under Chapter 64
10 prohibits such.
11   This is an issue cognizable under the
12 holdings in Schlue v. Delos, which is Supreme Court 115 at
13 851 regarding factual/procedural innocence claims tied to
14 constitution errors at my trial.
15   At trial the State offered Christina Renae
16 Ragland Storey as their primary witness that I was
17 allegedly the aggressor on April 2nd of 1995 and that I
18 allegedly executed Matt Storey in cold blood. And that's
19 on the record, Reporter's Record, Volume 4, pages 202
20 through 209; Volume 5, pages 213 through 226.
21   I testified then and still to this very day
22 contend that Matthew Storey was the aggressor on the
23 evening of April 2nd, 1995, when he called myself on the
24 phone, threatened myself on that phone, came over looking
25 for myself, fought myself for control of my weapon and

Page 53

1  died as a result of my justified use of deadly force. I
2  testified to that in the Reporter's Record, Volume 5,
3  pages 354 through 375, and 397 through 421.
4          This dispute is a clear issue of identity.
5  This identity issue also revolves around credibility
6  factors that were not made available to my original
7  illegal jury, as you heard Mr. Portnoy testify to, ma'am.
8          This Honorable Court now has access to this
9  newly-discovered evidence and has jurisdiction to consider
10 those issues when deciding the identity of whom acted as
11 the aggressor in this case and whom acted as the
12 defendant. If this Court refuses to address this identity
13 issue on the State's incorrect theory that Article
14 64.03(a)(1)(B) does not allow for such a consideration,
15 then I will have to object to Article 64.03(a)(1)(B) being
16 unconstitutional both factually and facially, as well as
17 object to my due process and equal protection rights under
18 the law being violated.
19         May this Court also take judicial notice of
20 the fact that Black's Law Dictionary defines the word
21 "identity" to mean, "the authenticity of a person or
22 thing," and that is in the Eighth Edition at page 761.
23         Texas Code of Criminal Procedure, Article
24 64.03(a)(1)(B) simply requires that identity was or is an
25 issue in this case. Texas law makers did not intend for

Page 54

1  that phrase to only mean identity of the accused or
2  perpetrator was the issue.
3          The State, however, wishes to twist the
4  statute to only mean such when it simply does not.
5  Self-defense is an identity issue because it is a form of
6  legal innocence not forbidden under Chapter 64.
7          Also in regards to the identity issue, my
8  newly-discovered evidence now on file goes to show that
9  Christina Storey and Vicki Storey were not and still not
10 credible witnesses in this case.
11         In this case Christina Storey's credibility
12 was impeached three times over, a fact that was
13 conveniently withheld from my jury's consideration.
14         The record clearly establishes that
15 Christina and Vicki both had no problem or fear of lying
16 on that witness stand right there, Your Honor. Those
17 factors fall under the issue of identity because
18 95 percent of the State's case was based upon their word
19 alone that I allegedly acted as the aggressor and while
20 downplaying my accounts of Matt Storey's hostile,
21 intoxicated and assaultive past.
22         This is where I brought into play earlier
23 about how did a disinterested jurist view Christina's and
24 Vicki's downplaying of the testimony, and that's where I
25 brought the accounts of Magistrate Judge Charles -- I

Page 55

1  believe it is Bleil, in the United States district
2  courthouse down the street, that he on this issue wrote in
3  my federal habeas proceeding, in short, that the women,
4  however, generally dismissed Storey's aggressive episodes
5  as either being playful or unintended -- if you would like
6  to look at this, Your Honor, for your consideration. I
7  bracketed those parts on page 8.
8          There is no doubt that my original jury
9  came to that same conclusion Magistrate Judge Bleil did.
10 My newly discovered evidence is being proffered to point
11 out identity evidence of Matt Storey's propensity to
12 become extremely hostile, violent and assaultive when he
13 became intoxicated.
14         This is the very same evidence which was
15 just found to be material in a friend of mine's case which
16 is cited at Smith versus Dretke, 417 F.3d at page 428
17 granted his Federal habeas writ.
18         Chapter 64 does not does not forbid such an
19 identity showing or credibility impeachment. As a matter
20 of fact, Wolfe versus State from the Texas Court of
21 Criminal Appeals noted that the legislation has broadened
22 the scope of Chapter 64 in its 2003 amendment to now
23 include appeals under Article 64.05 that were not
24 previously permitted, and that's at 120 SW3d, page 372,
25 footnote five.

Page 56

1          My case follows under the less stringent
2  post-2003 amendment under Chapter 64 law and the new
3  holdings of Smith versus State, 165 SW3d at 361.
4          My plea of not guilty by reason of
5  self-defense or justified legal innocence is an identity
6  issue being equivalent to an assertion that there is at
7  least a 51 percent chance that I would not have been
8  convicted of the offense of first-degree murder in this
9  case.
10         The forensic evidence within this case does
11 not remotely match the testimony of Christina Storey; for
12 example, the blood evidence. The record shows that the
13 State shied away from this evidence with Lieutenant Jerry
14 Vennum forgetting to bring 14 photographs showing spatter
15 on the car driven by Christina Storey that night.
16         The location of that blood within this
17 case, when you look at it on those photographs, it opens
18 many new, unanswered questions that arise about
19 Christina's versions of events. For example, if I were to
20 have shot Matthew Storey over the top of the car and again
21 as he was on the ground and as I was allegedly standing
22 over him, as Christina testified to at Reporter's Record
23 Volume 4, pages 203 to 207, how did I become covered in
24 blood? Whose blood is it?
25         Pamela Hand testified on the record that

Page 57

1  she saw blood smeared on some of the walls within my
2  townhome shortly after the events of April 2nd, 1995,
3  and that's at Reporter's Record Volume 5, pages 308
4  through 309, and was also offered in my Defense Exhibit 3.
5          Terry Hand saw blood within my townhome
6  also shortly after these events, specifically on the
7  stairwell casing and on myself and my on son's clothing,
8  and that's at Reporter's Record Volume 5, pages 295
9  through 296, and also shown in Defense Exhibits 3, 4 and
10 5.
11         Vicki Storey also saw myself covered in
12 blood and there was blood on my son's clothing, which is
13 in Reporter's Record Volume 4, pages 125 through 126.
14         Even when I was later arrested, hours
15 later, Sergeant Ben Bruce noted in his report that I had
16 blood on my hands, arms, chest and blue jean shorts. If
17 you would like to look at the underlining on this, too,
18 ma'am?
19         THE COURT: It's okay. I believe you.
20         MR. REGER: The State still possesses those
21 shorts and my son's clothing, but whose blood is on them?
22 That's the question. If we are to continue believe in
23 Christina Storey. How did it get there? Let this Court
24 take judicial notice that I testified on record that after
25 Matthew Storey struggled myself for my weapon and was shot

Page 58

1  that he then fell on top of myself, and that's at
2  Reporter's Record Volume 5, pages 366, 397, 398, 399
3  through 403 and page 417.
4          And what about the forensic autopsy
5  testimony from Dr. Marc Andrew Krouse at Reporter's Record
6  Volume 4, pages 175 through 176, which also corroborated
7  my testimony that Matthew Storey fell on top of me, that I
8  slid out from under him shooting awkwardly with the rifle
9  barrel eight to 10 inches off the ground shooting
10 horizontally?
11         These are just some of the many unanswered
12 questions regarding identity that I seek answers upon,
13 something that the Texas Legislature enacted Chapter 64 to
14 now allow. I am merely seeking to establish the truth and
15 thus prove my legal innocence by a preponderance of the
16 evidence, which I have more than sufficiently proven in
17 this case. This finding of the truth should be the
18 State's primary concern and duty to the public, as well.
19         I can't talk about the void punishment
20 stuff.
21         Going into my other issue in the motion for
22 new trial in regards to judicial notice, I filed evidence
23 into this DNA record which is not subject to reasonable
24 dispute that it is generally known within the territorial
25 jurisdiction of this Court and is capable of accurate and

Page 59

1  ready determination by resorting to the State's resources
2  whose accuracy cannot reasonably be questioned.
3          I requested this Court to take judicial
4  notice of these adjudicated facts and records numerous
5  times, and once again request this Court to take judicial
6  notice of same. The record exposes the prima facie case
7  that identity of the aggressor was and still is an issue
8  within this case.
9          The record also exposes prima facie facts
10 that Christina Storey is less than credible. She is
11 impeached, in fact, and that newly discovered identity
12 testimony exhibiting Matthew Storey to have been the
13 intoxicated, hostile, assaultive individual that compelled
14 me by valid threat to act in a manner in which I did on
15 April 2nd 1995.
16         These critically material identity issues
17 were never revealed to my jury, but this Court can easily
18 see what the results would have been if they had been
19 exposed to such.
20         The record also exposed -- well, that's
21 going into the void judgment -- strike that.
22         Thus, I am asking the Court to take
23 judicial notice of these undisputed facts that I pointed
24 out in the established record today. Plus I would ask the
25 Court to take judicial notice of the fact that Mr. Portnoy

Page 60

1  testified that he had never seen that material evidence
2  before, ma'am.
3          Somehow, the State also believes that I
4  should be raising these matters on newly-discovered
5  evidence and the illegal, null and void judgment within a
6  subsequent habeas writ. Despite knowing that the high
7  courts repeatedly complain about state judicial resources
8  being used for matters that could have been resolved in
9  the lower courts.
10         The State also knows I've also filed a
11 habeas writ in this case once before. Mr. Conder knows
12 that surely as there is a God in heaven that if and when I
13 were to file a subsequent writ that he'd most swiftly and
14 zealously pen a Section 4 abuse of writ response, and also
15 pen the findings of fact, conclusions of law and
16 recommendations of this Court that the writ be dismissed
17 under Section 4.
18         After this Court signed off on those
19 findings the record will be sent to the Court of Criminal
20 Appeals, which would in turn issue its infamous white
21 penny postcard order dismissing the writ under Section 4,
22 Article 11.07.
23         I've not only witnessed these events occur
24 many times over the years representing other inmates but
25 personally dealt with a case with Mr. Conder, Jeffery Lynn

Page 61

1  Poteete's case number 0551025D in the 371st in Court of
2  Criminal Appeals writ number WR-40, 174-02 involving
3  newly-discovered material, internal affairs photographs
4  suppressed by the State and the police therein. No
5  request for an affidavit from Mr. Poteete's attorney was
6  ever requested, nothing. He was just railroaded off to
7  the Court of Criminal Appeals within two weeks.
8      If I am forced to waste scarce judicial
9  resources to get these matters addressed in that manner, I
10 will then and only then file a subsequent writ into this
11 court. However, my issues once again fall up under the
12 purview of this Court under the jurisdiction vested in
13 Chapter 64, and an appeal is cognizable under Article
14 64.05.
15     It should be remembered that in the event
16 this Court were to grant this motion for new trial and
17 thereafter order DNA testing, I'd still be required to
18 file an 11.070 writ to get relief in that. And the case
19 that cites that procedure is Ard versus State, 191 Sw3d at
20 342.
21     With this said, standing on the entire null
22 and void record to cause number 0579930D, I would
23 respectfully pray this Court to grant this motion for new
24 trial with objections. A fundamental miscarriage of
25 justice has now been made known to this Court, and I so

Page 62

1  pray for relief. That's all.
2      MR. CONDER: May it please the Court, I
3  will be very brief.
4      The Texas Legislature established Article
5  64 and in doing so they set out five specific standards
6  you had to meet, and one we are discussing was an identity
7  issue in the case. The statute has been modified since
8  the original issuance in 2001, but the 2003 modifications
9  have nothing to do with the identity issue. That language
10 was not changed.
11     Primarily the changes in 2003 were simply
12 to allow the State to now appeal from a decision on a DNA
13 request, and it did some changing on the exoneration under
14 64.03 (a) (2) (A). The case law that has interpreted 64
15 said that when the defendant claims self-defense that
16 identity is not an issue. When they look at identity they
17 are looking at is there a question of whether this was the
18 person who did it, not the motivation behind it, not
19 whether there is some sort of legal excuse or
20 justification for it. The case law did not -- the
21 enactment of 64 did not allow them to open a broad base on
22 a writ of habeas corpus, such as newly-discovered evidence
23 claims.
24     If you look at some of the other cases
25 besides self-defense cases, they interpreted identity is

Page 63

1  not an issue when the defendant admits the offense or in
2  consent cases. Again, the this question of consent, could
3  it have been valid legal justification for committing the
4  offense. But whether it occurred or not, identity is not
5  an issue. Again, the issue why, versus whether this was
6  the person who did it.
7      Mr. Portnoy on the stand today in fact also
8  agreed with that point that self-defense is not an
9  identity issue. Self-defense goes generally, as I said,
10 back to why somebody committed the offense, not whether
11 the offense was committed.
12     In this case there was no evidence that
13 anyone other than the defendant shot Matthew Storey. The
14 defendant in this case has raised numerous allegations of
15 newly-discovered evidence and questions regarding the
16 credibility of state's witnesses. Again, the case law is
17 clear that actual innocence claims based upon
18 newly-discovered evidence and also misconduct and
19 ineffective assistance of counsel must be raised by
20 Article 11.07, and this Court does not have jurisdiction
21 to consider it under a 64.03 motion.
22     Again, habeas corpus case, that is the
23 avenue he must take in order to overcome the burdens that
24 come under 11.07.
25     Article 64 requests for most convictions --

Page 64

1  that testing is not broad as to incorporate all of the
2  other issues he has raised today. It simply does not meet
3  the standards of 64.03, and because he raised self-defense
4  and admitted the offense does not support his position in
5  this case. So this Court was correct in earlier denying
6  his request for postconviction DNA testing.
7      That's it from the State.
8      THE COURT: Okay. Upon hearing the
9  evidence presented, the case law and the arguments of
10 counsel, as well as Mr. Reger proceeding pro se, the Court
11 will hereby overrule Mr. Reger's motion for new trial and
12 allow my original ruling denying DNA testing under Article
13 64.03 to stand.
14     Either side request that I enter a written
15 order to that effect?
16     MR. REGER: Yes, ma'am.
17     THE COURT: Okay. I will prepare a written
18 order and file that, and that will conclude our
19 proceedings for today.
20     Mr. Reger, I will go ahead and tell the
21 clerk that they can send you back. Did you have something
22 else?
23     MR. REGER: Yes. Upon the supplemental
24 record I had some further requests. I already have copies
25 of them if I can get them filed into the record. There

Case 4:07-mc-00033-A   Document 3-13   Filed 11/29/07   Page 19 of 20   PageID 213
STATE V. RUSSELL JAY REGER
VOLUME 1 OF 1 VOLUME

20 (Page 65)

Page 65

1   was a problem with two pages being left out of the
2   original motion for new trial that I wanted to show the
3   clerk where they are at and which ones they are, because
4   I've been asking for them to get them included back into
5   it.
6        THE COURT:  Make copies and make sure they
7   get included in the supplemental record.
8        MR. REGER:  I have this additional request.
9        THE COURT:  What is that?
10       MR. REGER:  For the supplemental record, I
11  am asking for the additional request to be put into it.  I
12  have a copy for the State.
13       THE COURT:  We will file that as well then.
14       Is there anything else we need to do on the
15  record?
16       MR. REGER:  That's it.
17       THE COURT:  Okay.  Thank you all.
18       (Proceedings adjourned)
19
20
21
22
23
24
25

Page 66

1  STATE OF TEXAS

2  COUNTY OF TARRANT

3       I, Judy D. Miller, Official Court Reporter in and
4  for the Criminal District Court No. 3 of Texas in and for
5  Tarrant County, do hereby certify that the above and
6  foregoing contains a true and correct transcription of all
7  portions of evidence and other proceedings requested in
8  writing by counsel for the parties to be included in this
9  volume of the Reporter's Record in the above-styled and
10 numbered cause, all of which occurred in open court or in
11 chambers and were reported by me.

12      I further certify that this Reporter's Record of
13 the proceedings truly and correctly reflects the exhibits,
14 if any, offered by the respective parties, if requested.

15      I further certify that the total cost for the
16 preparation of this Reporter's Record is reflected in the
17 original copy of this volume and was paid/will be paid by
18 Tarrant County.

19      WITNESS MY OFFICIAL HAND, on this the 29th day of
20 August, 2006.

COPY

---

Judy D. Miller, CSR
Texas CSR No. 191, Exp: 12/31/06
Official Court Reporter
Criminal District Court No. 3
401 W. Belknap, 7th Floor
Fort Worth, Texas  76196
Telephone:  (817)884-1359
email: jmiller@tarrantcounty.com